### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CB&I AREVA MOX Services, LLC | ) |
| Plaintiff, | ) No.: 16-CV-950 |
| | ) (Judge Wheeler) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

### SUPPLEMENTAL COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

CB&I AREVA MOX Services, LLC (MOX Services), by and through its undersigned counsel, files this complaint for declaratory relief and damages, and alleges as follows:

### NATURE OF THE CASE

1.    Plaintiff MOX Services brings this action to determine its entitlement to fee under its cost reimbursement prime contract with the National Nuclear Security Administration (NNSA) to construct one of the largest and most complex fabrication facilities in the world, the Mixed Oxide Fuel Fabrication Facility (MFFF).  Under the original parameters of the contract, MOX Services had the opportunity to earn various fees that totaled 6%, or about $150 million, of the estimated construction costs of $2.5 billion.

2.    Due to events and circumstances caused by NNSA or for which NNSA accepted the risk – including domestic and international political events that have directly impacted the project, uneven congressional support for the project evidenced by inadequate funding, and NNSA mismanagement – the work MOX Services must

perform to fulfill the contract has increased substantially.  Rather than properly acknowledge the effects of these events and circumstances as scope changes to the contract or risks assumed by NNSA, at nearly every turn NNSA has blamed MOX Services, and has refused to adjust the schedule and cost targets MOX Services must meet for entitlement to incentive fee, and has treated the impacts as contractor-caused cost overruns that do not entitle MOX Services to fixed fee.

3. NNSA has all but stripped the largest fee pool, "incentive fee," from the contract. The contract entitled MOX Services to periodic incentive fees from FY2011 – FY2015, so long as the project stayed within defined cost and schedule parameters. NNSA wrongly has deemed the cost increases and schedule expansion to be MOX Services' fault.  Based on this misguided conclusion, NNSA improperly has eliminated about $53 million from a negotiated incentive fee pool of roughly $80 million, and has clawed back another $21 million in incentive fee that NNSA had paid MOX Services on a provisional basis.  When the project's estimated costs and schedule are properly adjusted for realized risks NNSA assumed, MOX Services presently is entitled to payment of all clawed back and withheld incentive fee.

4. Additionally, treating all cost increases as MOX Services' fault rather than as a result of the realization of NNSA-assumed risks, NNSA has denied MOX Services any fee whatsoever on over $1 billion of increased work scope MOX Services performed as of the conclusion of the project's last rebaselining effort, the "2012 Rebaseline Process," in April 2013.  MOX Services is entitled to fee for its performance of the changed work.

5.      The end result of NNSA's unfounded blaming of the cost and schedule increases on MOX Services is that the contractor's fee has become vanishingly small in relation to the work MOX Services has performed.  As the project has progressed, MOX Services' fee has become ever smaller compared to the tremendous resources demanded by the facility construction.  Although MOX Services incurs over $1 million in costs every working day on average, NNSA effectively has paid MOX Services no fee for several years, nor has NNSA held out the prospect of fee ever becoming part of the contract again.

6.      In this action, MOX Services seeks to recover the over $70 million in incentive fee that has been wrongly withheld or clawed back by NNSA.  MOX Services also seeks a reasonable fee of about $100 million on the scope of work changes NNSA has required MOX Services to perform.  These changes are rooted in risks NNSA agreed to accept regarding whether certain events or circumstances that could impact the project would occur.  Additionally, without any proper basis, NNSA has refused to allow MOX Services to recover its reasonable and allocable costs of over $2 million of preparing the request for equitable adjustment (REA) that underlies the certified claims whose denials are appealed here.  Last, MOX Services seeks interest on all recovered amounts.

7.      In particular, MOX Services appeals four contracting officer's final determinations (COFDs).  First, MOX Services appeals NNSA's rejection of MOX Services' certified claim for payment of contractual incentive fee, and, related, MOX Services appeals a second COFD, set forth in the same NNSA letter, that required MOX Services to repay to NNSA incentive fees that had been paid to MOX Services on a

3

provisional basis.  MOX Services' incentive fee certified claim, with supporting

accounting schedules, is attached as Exhibit A.  The exhibits MOX Services

submitted to NNSA in support of its Incentive Fee certified claim are voluminous,

and are not included in Exhibit A.  NNSA's letter setting forth its COFD denying this

certified claim and its COFD requiring MOX Services to repay provisional incentive

fee is attached at Exhibit B.

8.      The third COFD MOX Services appeals in this action is NNSA's denial of MOX

Services' certified claim for payment of fixed fee as compensation for performing

changed work that resulted from risks NNSA assumed.  This certified claim, with

supporting accounting schedules, but not the voluminous supporting exhibits, is

attached at Exhibit C.  The NNSA COFD denying this claim is attached at Exhibit D.

9.      Last, MOX Services appeals NNSA's COFD that denied MOX Services' certified

claim for its reasonable costs of preparing the REA that largely formed the basis for

the certified claims at Exhibits A and C.  This certified claim with exhibits and the

COFD denying this claim were attached to the initial Complaint.  *See* Dkt. Nos. 1-1,

1-2.  The narrative portion of the REA itself is attached at Exhibit E.

## **JURISDICTION**

10.     This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. §

1491, and the Contract Disputes Act, 41 U.S.C. § 7104.

11.     Under Rule 57 of the United States Court of Federal Claims, this Court may order a

speedy hearing on the declaratory judgment causes of action of this Complaint.

Supplemental Complaint for Damages and Declaratory Relief, No. 16-CV-950

## PARTIES

12.   Plaintiff MOX Services is the prime contractor that is constructing the MFFF at the
      Savannah River Site near Aiken, South Carolina.   MOX Services is the successor in
      interest to the original prime contractor, Duke Cogema, Stone & Webster, LLC.

13.   Defendant is the United States of America, acting through the Department of Energy
      (DOE) and the NNSA, a component agency of the DOE.  (Except where
      distinguishing between the DOE and NNSA is necessary for clarity, this Complaint
      will refer to the United States, DOE, and NNSA as "NNSA.")  NNSA is the owner of
      the MFFF, and has contracted with MOX Services to construct it.

## FACTUAL BACKGROUND

*The Purpose and Scale of the MFFF*

14.   The MFFF is designed to transform weapons-grade plutonium into mixed oxide fuel
      rods that may be irradiated in commercial nuclear power plants.  The MFFF
      represents the United States' satisfaction of its obligations under the Plutonium
      Management and Disposition Agreement (PMDA) between the United States and
      Russia.  Under the PMDA, the United States and Russia agreed to dispose of the same
      significant amounts of weapons-grade plutonium roughly in parallel.

15.   Constructing the MFFF is a massive undertaking.  The main physical plant will
      require over 4.5 million cubic feet of concrete and 70 million pounds of reinforced
      steel.  The hundreds of process units and other equipment to be installed in the plant,
      many of which include conveyors and lifts and are sealed within hardened glove
      boxes, are being fabricated by specialty manufacturers around the country and around
      the world at great expense.   The controls and utilities that join the building to the

equipment will require, among other utility delivery channels, over 80 miles of piping, nearly 1300 miles of cabling, and over 1.3 million pounds of HVAC ducts.

16.     The costs of the design professionals and administrative functions demanded by this complex project, termed "hotel load," includes engineers in many disciplines, schedulers, contract administrators, accountants, human resources professionals, quality assurance and safety staff, and others.  As a nuclear construction project working with weapons-grade plutonium and uranium oxide, the work is governed by Nuclear Regulatory Commission (NRC) regulations.  The project's hotel load costs can approach $180 million per year.  That is, without hanging a single piping bracket or terminating a single electrical connection, the MFFF project demands that MOX Services expend great effort at significant expense just to maintain construction readiness.

*Contract Type, Key Assumptions, and Changes*

17.     In March 1999, NNSA awarded contract DE-AC02-99CH10888 (the "Contract") to MOX Services' predecessor in interest to construct, operate, deactivate, and perform other services with respect to the MFFF.  On May 20, 2008, the parties executed Modification 124 to the Contract, which definitized the construction phase of the Contract, or Option 1.  Excerpts of the voluminous Contract are attached at Exhibit F.

18.     Option 1 was awarded on a cost-reimbursement basis, with MOX Services eligible to earn various types of fee, including incentive fee.  The Contract includes the clause, FAR 52.243-2, Changes (Cost Reimbursement).  This clause allows the NNSA contracting officer to make changes within the scope of the project, and requires the contracting officer to make commensurate adjustments to the estimated cost and

schedule, fee and other terms.  The changes clause also applies to constructive changes, *i.e.,* changed work performed by the contractor without a formal change order.  The Contract set forth several types of risks that were not included in the original scope, and for which NNSA would be responsible if the risks materialized.  The potential impacts of these risks were significant in terms of cost and schedule, but impossible to quantify.

19.     The Contract also acknowledges the risks associated with uncertainties in Congress's appropriations process.  To effectively plan and manage a project of the size and scope of the MFFF requires sufficient, predictable, and reliable congressional funding.  NNSA accepted risks related to the amount and timing of project funding, and agreed to process appropriate changes to the Contract if this risk materialized.

20.     The Contract set forth NNSA's construction strategy which designated MOX Services to be a construction manager.  The Contract prohibited MOX Services from performing construction itself, and directed MOX Services to obtain construction services through fixed-price subcontractors.  A major premise underlying NNSA's construction strategy was that a sufficient number of willing and capable potential subcontractors existed to foster competition and drive down costs.  The risk that NNSA's construction strategy might fail to produce adequate competition too was excluded from the scope of the Contract.

21.     Accordingly, these risks were excluded from the scope of Option 1, and their potential costs were excluded from the cost estimates.

Supplemental Complaint for Damages and Declaratory Relief, No. 16-CV-950

*Option 1 Incentive Fee Provisions and NNSA Actions Regarding Incentive Fee*

22.     Under Option 1 of the Contract, beginning in the first quarter of Fiscal Year 2008,

MOX Services was eligible to earn quarterly incentive fee for making progress

toward completing MFFF construction within certain cost and schedule parameters.

The Contract's "Project/Cost Incentive Fee Band & Schedule" includes a "6.75% Fee

Schedule" and a "7% Fee Schedule."  The "7% Fee Schedule" became effective upon

the execution of a contract modification for a "hot start" of the project.  MOX

Services contends that NNSA wrongly has refused to execute such a modification,

and thus MOX Services is entitled to use the 7% Fee Schedule.  The issue regarding

whether the incentive fee amounts available under Option 1 should accord to the

6.75% Fee Schedule or the 7% Fee Schedule is subject to ongoing litigation between

the parties.  The incentive fee certified claim and this complaint uses the 7% Fee

Schedule.  The amounts of incentive fee available under the 7% Fee Schedule are as

follows:

| 2008 | $ 3,000,000 | 2012 | $ 14,500,000 |
| 2009 | $ 12,000,000 | 2013 | $ 9,500,000 |
| 2010 | $ 14,100,000 | 2014 | $ 8,490,019 |
| 2011 | $ 15,400,000 | 2015 | $ 5,000,000 |

23.     Thus, in each of the four quarters of Fiscal Year 2008, so long as the project was

within the cost and schedule parameters set forth in the Contract, MOX Services

would be paid $750,000 in incentive fee; in Fiscal Year 2009, each quarter of

incentive fee was worth $3 million; and so on.

24.     MOX Services meets the incentive fee cost parameters in every quarter in which the

        Estimate at Completion (EAC) is projected to be below the total estimated cost of the

        Contract's CLIN 002, or the "Target Cost," plus the cost allowance set forth in the

        Contract's Cost Incentive Fee Band.

25.     MOX Services meets the incentive fee schedule parameters in every quarter in which

        the contractor adheres to the project schedule and Period of Performance, plus the

        schedule allowance set forth in the Schedule Incentive Fee Band.

26.     The incentive fee provisions also include a vesting schedule.  For at least the first year

        after MOX Services invoices for quarterly incentive fee, that entire incentive fee is

        provisional.  So long as MOX Services' performance has remained within the cost

        and schedule parameters throughout the previous four quarters, 50% of the

        provisional incentive fee payment becomes final, and can never be reclassified or

        taken back by NNSA.  The other half of each quarter's incentive fee remains

        provisional until the MFFF construction is complete, and NNSA approves the MFFF

        to start operations.  At that time, and not sooner, MOX Services' cost and schedule

        performance will be reconciled and all remaining provisional incentive fee either

        becomes final or must be remitted to NNSA.

27.     The Contract's "Final Cost/Schedule Incentive Fee Payment Determination"

        provision states that the determination of whether provisional incentive fee payments

        will convert to final payments will be made at "project completion, defined as the

        submittal and acceptance of the [approval for the start of operations] package."

        Further, the Contract's "Final Incentive Fee Payment" provision states that the "final

        incentive fee payment will be based upon overall progress and will reflect the

9

difference between the final incentive fee determination and the sum of quarterly provisional incentive fee payments made during the period of the contract."

28.     From the first quarter of 2008 through the fourth quarter of 2010, NNSA paid MOX Services $29.1 million in quarterly incentive fee payments.  Of that amount, NNSA has agreed that $7.5 million has become final, and, until the COFD set forth at Exhibit B, NNSA treated $21.6 million of the paid incentive fee as provisional.   The amounts NNSA treated as provisional are as follows:

| Period Earned (FY, Quarter) | Quarterly Incentive Amount Available | Provisional % | Provisional Value |
|---|---|---|---|
| 2008, Q1 | $750,000 | 50% | $375,000 |
| 2008, Q2 | $750,000 | 50% | $375,000 |
| 2008, Q3 | $750,000 | 50% | $375,000 |
| 2008, Q4 | $750,000 | 50% | $375,000 |
| 2009, Q1 | $3,000,000 | 50% | $1,500,000 |
| 2009, Q2 | $3,000,000 | 50% | $1,500,000 |
| 2009, Q3 | $3,000,000 | 50% | $1,500,000 |
| 2009, Q4 | $3,000,000 | 50% | $1,500,000 |
| 2010, Q1 | $3,525,000 | 100% | $3,525,000 |
| 2010, Q2 | $3,525,000 | 100% | $3,525,000 |
| 2010, Q3 | $3,525,000 | 100% | $3,525,000 |
| 2010, Q4 | $3,525,000 | 100% | $3,525,000 |

29.     Ever since it paid MOX Services $3,525,000 in provisional incentive fee for the fourth quarter of 2010, NNSA has contended that MOX Services' performance has never met the incentive fee cost and/or schedule parameters.  Accordingly, NNSA has refused to pay MOX Services any incentive fee for the period FY 2011 to FY 2015. The total amount of outstanding Incentive Fee is $52.9 million.

30.     On December 7, 2016, in answer to MOX Services' certified claim for incentive fee, NNSA issued a COFD that denied MOX Services any entitlement to outstanding incentive fee, and demanded that MOX Services repay all provisional incentive fee.

31.     Notwithstanding that the MFFF construction is years from being completed, the COFD claimed that MOX Services could not earn any unpaid incentive fee and that NNSA was entitled to the immediate repayment of the entire $21.6 million in provisional incentive fee because those "payments exceed[] the overall final Cost/Schedule Incentive Fee determination of $0 calculated by the Contracting Officer."

32.     This COFD concluded by asserting "that the amount of $21,600,000 constitutes a debt to the Government in accordance with the contract terms, and repayment of this amount in full to NNSA within 30 days of the date of this Contracting Officer's Final Decision is hereby demanded."   This COFD threatened that if MOX Services did not repay the $21.6 million in full within 30 days, NNSA would begin to apply interest to the "debt" and may initiate procedures to offset the "debt" against payments owed to MOX Services in the normal course of the project.

33.     MOX Services contested NNSA's interpretation of the Contract's incentive fee provisions on which it relied in clawing back provisional incentive fee, but NNSA refused to reconsider its position or to maintain the status quo pending a judicial ruling as to the propriety of the claw back.

34.     Through a combination of MOX Services payments to NNSA and NNSA short payments of MOX Services' invoices, MOX Services satisfied NNSA's demand for the return of $21.6 million in provisional incentive fee, plus interest.

## RISKS ACCEPTED BY NNSA

*Risks Related to the PMDA's Russian Parallelism Requirement*

35.     The 1998 PMDA that gave rise to the MFFF requires the plutonium disposition efforts of the United States and Russia to proceed in rough parallel with each other. Because the risks associated with implementing the parallelism requirement were not quantifiable and were beyond MOX Services' control, the Contract specifically and broadly excluded risks "related to" the Russian parallelism requirement from its scope.  Because NNSA accepted these risks, they were beyond the scope of the Contract, and their potential impacts on the project were not included in the MFFF cost or schedule estimates.

36.     Through most of the 2000s, the Russian program lagged behind that of the United States, with the parallelism requirement exerting a drag on MFFF progress. Examples of Russia's delays in starting to fulfill the PMDA include that Russia was slow to settle on the MFFF methodology to meet its plutonium disposition obligations.  Then, once Russia determined that it would rely on versions of the same technology MOX Services would deploy on the U.S. MFFF, it took years to work out and ratify a liability protocol under which Russia would use the technology.

37.     During this time, MOX Services requested that NNSA authorize MOX Services to conduct pilot procurements and otherwise engage vendors, such as through vendor workshops, entering Blanket Ordering Agreements, and other means.  The purpose of the requested vendor engagements was to assess the constructability of the proposed process unit designs; to evaluate the marketplace of capable manufacturers, and to

Supplemental Complaint for Damages and Declaratory Relief, No. 16-CV-950

determine the likely amount of effort needed to complete the designs, build and test the units; and to estimate the likely costs and schedule of these procurements.

38.     In light of Russia's uneven showing of its commitment to meeting the PMDA, NNSA prohibited MOX Services from conducting pilot procurements on MFFF process units and other equipment, and from otherwise engaging with potential vendors, lest it appear to Russia that NNSA was willing unilaterally to dispose of a portion of the United States' stockpile of weapons grade plutonium.

39.     In order to maintain parallelism with Russia under the PMDA, NNSA refused to allow MOX Services to conduct the requested activities.  As a result of NNSA's refusal, prior to submitting its MFFF construction proposal MOX Services was unable to test assumptions regarding necessary procurements of process units and other equipment, including assumptions underlying cost and schedule estimates.

40.     The equipment estimating methodology MOX Services was allowed to use was a "top down" approach that applied assumed complexity factors on assumed representative units to extrapolate labor and materials cost estimates on other equipment.  This methodology proved unsuitable, and, as a result, the estimates associated with designing and manufacturing the units, both in terms of discrete procurement costs and schedule, were far short of the actual resources and time that would be needed. Moreover, for several years the process unit procurement cycle controlled the project's critical path, such that the longer procurement durations prolonged the schedule and gave rise to significant increases in the MFFF cost estimates in the form of hotel load-related costs.

41.     It was not until late 2007, well over four years after MOX Services first requested

NNSA to allow MOX Services to engage vendors, that NNSA finally authorized

MOX Services to implement one means of vendor engagement, pilot procurements.

The results of these late pilot procurements revealed that the process unit estimates

were far too low, both in terms of costs and duration.  For example, much more work

was needed to finalize the designs than was estimated using the top down estimating

approach; there were fewer capable process unit manufacturers available to design

and manufacture the equipment than had been presumed at the time of estimating; the

manufacturers needed much more support than anticipated to meet NRC regulatory

requirements; and MOX Services' field engineering staff had to be significantly

increased to address the great number of vendors' fabrication and assembly issues.

42.     NNSA's refusal to allow MOX Services to engage vendors stemmed from NNSA's

concern for maintaining roughly equal progress with Russia's efforts in meeting the

PMDA obligations.  This was a risk "related to the requirement for rough parallelism

with the Russian" weapons-grade plutonium disposal program that NNSA explicitly

accepted in the Contract.

43.     As of the end of the 2012 Rebaseline Process, the materialized risks related to the

Russian parallelism requirement caused significant increases in MFFF construction

work scope and estimates regarding its costs and schedule.

*Change in Method of Construction Performance*

44.     NNSA's original construction strategy called for MOX Services to serve as the

construction manager.  The Contract prohibited MOX Services from self-performing

construction; rather, it directed MOX Services to contract out the work through fixed-

price, competitively bid subcontracts.  MOX Services' Construction Management and Construction Subcontracting Plans reflected this method of construction performance.

45.     NNSA accepted the risk that its chosen method of construction performance might fail.  For example, MOX Services' cost estimate explicitly assumed that a sufficient number of qualified subcontractors would be willing to compete for fixed-price subcontracts.

46.     NNSA's method of construction performance could not be carried out, because too few contractors to create competition were capable and willing to take on fixed-price construction work that would be governed by NRC regulations.  Ultimately, NNSA modified the Contract to remove the requirement that MOX Services subcontract the construction work on a fixed-price basis, and allowed MOX Services to self-perform construction scope.

47.     The risk accepted by NNSA that its method of construction performance might fail manifested in multiple ways.  Rather than simply oversee competitively awarded fixed-price subcontracts performed by capable vendors, after the modification, MOX Services was required to develop its own capability to perform many aspects of MFFF construction.  Also, the shift away from fixed-price subcontracts in which the subcontractors were responsible for ensuring that their work met NRC regulations required MOX Services to expend additional effort to ensure that subcontracted work conducted on a time and materials basis met NRC quality standards.

48.     As of the end of the 2012 Rebaseline Process, the materialized risks related to NNSA's chosen method of construction performance caused significant increases in MFFF Construction work scope and estimates regarding its costs and schedule.

*Design Immaturity at the Time of Estimating*

49.    Due to circumstances beyond MOX Services' control, NNSA required MOX Services to submit its construction cost estimates before the designs were sufficiently mature to support the estimating function.

50.    In 2002, soon after NNSA stated that it would use the mixed oxide fuel method to meet the United States' obligations under the PMDA, NNSA announced that it would begin shipping weapons-grade plutonium to SRS.  The State of South Carolina was resistant to accepting these materials without receiving a benefit in exchange. Ultimately, the South Carolina congressional delegation brokered a deal that was designed to speed groundbreaking on the MFFF, and thus bring hundreds or thousands of jobs to the State as soon as possible.

51.    After the political resolution in South Carolina there were several years of delays in finalizing the terms by which the United States would provide technical assistance to Russia to enable Russia to build its own MFFF.

52.    In the period of Russian delay, in addition to refusing MOX Services' request to engage potential vendors in support of the estimating function, NNSA limited MFFF funding, instituted a hiring freeze, cut MOX Services' operating budget, and took other actions that restricted MOX Services' ability to produce accurate cost and schedule estimates.

53.    As soon as the United States and Russia reached agreement on U.S. technical support of the Russian MFFF, NNSA exercised the Contract option for MOX Services to construct the U.S. MFFF.

54.     In light of the long delay in the federal government's ability or willingness to fulfill its promise to South Carolina to start MFFF construction, following the Russian agreement, NNSA directed MOX Services to submit its construction proposal, including cost and schedule estimates, on an accelerated timeline.  Despite NNSA's understanding that the designs did not yet meet DOE guidelines to support estimating, NNSA nonetheless required MOX Services to submit its construction proposal.

55.     The rushed cost and schedule estimates, based on preliminary designs and other uncertainties, failed to reflect the scale of the project and the intricacies of many of its elements, which were unknown to the parties at the time.  Only later, when the actual complexities of the designs, and the designs' constructability under NRC strictures, became known, could the real measure of the resources demanded by the MFFF construction be reasonably estimated.

56.     Among other things, it came to light only after MOX Services submitted its Option 1 proposal that many firms on which MOX Services hastily was forced to rely did not truly possess the NRC-ready systems that they had purported.  MOX Services experienced such unmet assumptions in the areas of process unit, equipment, and commodities manufacturing; the purchase of craft labor installation of commodities; quality assurance; and engineering associated with preparing final designs and assembly and installation plans for process units and other equipment.

57.     In short, the work actually performed by MOX Services has greatly surpassed in amount and character the work contemplated at the inception of Option 1.  As of the end of the 2012 Rebaseline Process, the design immaturity at the time of estimating

caused significant increases in MFFF Construction work scope and estimates regarding its costs and schedule.

*Congressional Funding*

58.    In negotiating the Contract, the parties understood that the risk of funding changes was impossible to quantify, that project funding was beyond MOX Services' ability to control, and that funding changes could significantly impact the project schedule and costs.  Rather than attempt to include the potential costs and schedule impact in the Contract, NNSA agreed to accept risks related to funding, and to process contract changes should they occur.

59.    NNSA's assumed risks related to funding have materialized.  Following the completion of the Rebaseline Process, NNSA refused to provide MOX Services with a funding profile by which MOX Services could plan its work.  NNSA's refusal to provide a funding profile for FY2013 or beyond made it impossible to develop a construction schedule or an updated EAC.

60.    In all budgetary and appropriations cycles since FY2013, the funding for MFFF construction was insufficient for MOX Services to make real progress towards completion.  NNSA often has admitted as much.

61.    So long as the inadequate and uncertain funding situation remains, MOX Services will be unable to formulate a meaningful EAC or construction schedule.

## MOX SERVICES' PREPARATION OF A REQUEST FOR EQUITABLE ADJUSTMENT FOR INCENTIVE FEE

62.    In 2014 and 2015, MOX Services contracted with a law firm  and other consultants to investigate and prepare an REA.  The REA presented MOX Services' position

regarding the degree to which NNSA should adjust the cost and schedule projections for the completion of MFFF construction to account for work scope changes, including for materialized risks NNSA had accepted under the Contract.

63.     The REA concluded that the required cost and schedule adjustments brought MOX Services' performance within the parameters of the Schedule and Cost Incentive Fee Bands, such that MOX Services was entitled to payment of suspended incentive fee.

64.     NNSA refused to negotiate the REA.  MOX Services then updated and converted the REA into MOX Services' certified claim for incentive fee, Exhibit A.

65.     MOX Services incurred over $2 million in REA preparation costs

66.     After a dispute arose between MOX Services and NNSA regarding the allowability of these REA preparation costs, NNSA requested that MOX Services invoice NNSA separately for these charges.  MOX Services then invoiced NNSA in the amount of $2,244,972 for reimbursement of these professional costs.  This invoice was designated Voucher 202C.

67.     NNSA refused to pay Voucher 202C.  MOX Services submitted a certified claim for payment of Voucher 202C (Dkt. No. 1-1), which NNSA denied in the COFD (Dkt. No. 1-2).

## COUNT I -  BREACH OF CONTRACT (INCENTIVE FEE)

68.     MOX Services' realleges all of the preceding paragraphs as if fully stated herein.

69.     MOX Services is entitled to payment and vesting of specified incentive fee for every quarter from FY 2008 to FY 2015 that its performance is within schedule and cost parameters, as adjusted for changes, NNSA-caused delays and cost increases, and the impacts of risks NNSA assumed in the Contract.

70.     Of nearly $82 million of incentive fee provided for in Option 1, NNSA has denied the obligation to pay nearly $53 million in incentive fee and has clawed back over $21 million in provisional incentive fee.

71.     When the Schedule Incentive Fee Band is properly adjusted to account for NNSA-caused delays and risks NNSA assumed, including, but not limited to, risks related to the Russian parallelism requirement and to funding uncertainties, throughout the period from FY 2008 to the end of the vesting period relevant to FY 2015 Incentive Fee, MOX Services' performance has met the Option 1 schedule parameters necessary to permanently entitle it to all incentive fee payments.

72.     Regarding the Cost Incentive Fee Band, MOX Services meets this requirement in every quarter that the EAC is less than or equal to the estimated cost of CLIN 002, plus the Incentive Fee Band.  MOX Services' performance meets this requirement for at least three reasons.  First, since the conclusion of the 2012 Rebaseline Process, the government-created uncertainties and NNSA-assumed risks regarding MFFF funding have made it impossible to calculate a meaningful EAC as contemplated by the Contract's incentive fee provisions.  For Fiscal Years 2013 and 2014 NNSA instructed MOX Services not to provide an annual EAC update, and to rely on the 2012 Rebaseline Process figures.  NNSA's direction for Fiscal Year 2015 was for MOX Services to provide only a partial update to the EAC.  Thus, the parties' last agreed EAC is from the end of the 2012 Rebaseline Process, and that EAC is below the current estimated cost of CLIN 002.

73.     Second, CLIN 002 is the single line item for all Option 1 MFFF construction funds, and the Contract's incentive fee provision equates "Target Cost" with CLIN 002.

Because all construction funds, whether recognized by NNSA as the result of changes or deemed by NNSA to be cost overruns, are added to CLIN 002, the EAC always remains equal to or less than CLIN 002 plus the Incentive Fee Band.

74. Third, changes under the changes clause and risks assumed by NNSA entitle MOX Services to adjustments to the estimated costs of CLIN 002.  Once these appropriate adjustments are recognized, MOX Services' cost performance falls within the range that entitles it to payment of all suspended and clawed back incentive fee.

75. MOX Services has suffered damages of $74,490,019, plus accrued interest, as a result of NNSA's breach of the Option 1 incentive fee provisions.

### COUNT II -  DECLARATORY RELIEF (PREMATURE CLAW BACK OF PROVISIONAL INCENTIVE FEE)

76. MOX Services' realleges all of the preceding paragraphs as if fully stated herein.

77. On December 7, 2016, MOX Services received a COFD that demanded the immediate repayment of $21.6 million in provisional Cost/Schedule Incentive Fee payments made to MOX Services.  Exhibit B.  MOX Services timely paid this demand.

78. The COFD reflected a premature and incorrect application of the Contract's "Final Cost/Schedule Incentive Fee Payment Determination" provision and violated other Contract provisions which dictate that the final incentive fee determination cannot be made until project completion.

79. Under the incentive fee terms, NNSA may claw back provisional incentive fee, if at all, only at the end of Option 1 performance.  Before then, if NNSA determines that MOX Services' performance no longer meets cost and schedule parameters for

entitlement to incentive fee, any provisional incentive fee will remain provisional, and in possession of MOX Services, until NNSA determines that MOX Services' performance again meets the criteria for entitlement to payment or vesting of incentive fee.

80.     The parties have a fundamental dispute concerning when the overall final incentive fee determination is to be made under the terms of the Contract.  In particular, MOX Services contends that NNSA is not entitled to determine whether repayment of provisional incentive fee is warranted until Option 1 is complete.

81.     The speedy resolution of this contract interpretation dispute is necessary to provide certainty to the parties and to prevent undue financial hardship to MOX Services caused by NNSA's premature final incentive fee determination.  NNSA's wrongful and premature claw back of provisional incentive fee negated the only fee paid to MOX Services by NNSA over the past several years.  Denying MOX Services' use of provisional incentive fee has imperiled the project, as MOX Services justifiably relied on this incentive fee to pay for nonreimbursable project costs such as employee morale programs, community and charitable giving, non-billable business expenses and associated cost-of-money expenses.  Such cumulative, nonreimbursable costs increase as the schedule is prolonged.  MOX Services respectfully requests that under Rule 57 of the Rules of the United States Court of Federal Claims this Court provide a speedy hearing on this Count II.

82.     Monetary damages alone will not provide adequate relief to MOX Services.  Because construction of the MFFF is ongoing, it is necessary to resolve whether the Contract

permits NNSA to make a final incentive fee determination at any time prior to project completion.

### COUNT III - BREACH OF CONTRACT (FIXED FEE ON OUT-OF-SCOPE WORK AND FOR THE REALIZATION OF RISKS NNSA ASSUMED)

83.    MOX Services' realleges all of the preceding paragraphs as if fully stated herein.

84.    From the period between the 2007 Baseline and the conclusion of the 2012 Rebaseline Process, MOX Services has performed approximately $1.05 billion in out-of-scope work under the changes clause, much of which has resulted from risks NNSA assumed in the Contract.

85.    Under the changes clause, and pursuant to the parties' risk allocations in the Contract, MOX Services is entitled to a reasonable fixed fee of 10% on the out-of-scope work it has performed on account of changes and work under specific realized risks performed through the conclusion of the 2012 Rebaseline Process.

86.    Due to NNSA's failure to modify Option 1 of the Contract to provide fee to compensate MOX Services for this work, MOX Services has suffered damages of $105,189,406, plus interest.

### COUNT IV - BREACH OF CONTRACT (REQUEST FOR EQUITABLE ADJUSTMENT PREPRATION COSTS)

87.    MOX Services' realleges all of the preceding paragraphs as if fully stated herein.

88.    After MOX Services realized that it no longer shared an understanding with NNSA as to appropriate adjustments to the project costs and schedule, MOX Services engaged advisers, including attorneys, consultants and other professionals, to assist MOX Services in preparing the REA.

89.    MOX Services incurred $2,244,972 in consultant costs to prepare the REA. Those

costs were incurred for the genuine purpose of materially furthering negotiations between MOX Services and NNSA regarding cost and schedule adjustments under the Contract. The REA preparation costs incurred were reasonable and allowable contract administration costs that are recoverable under the terms of the Contract, including 48 C.F.R. 31.205-33, *Professional and Consultant Service Costs*.

90.   NNSA breached the Contract by refusing to reimburse MOX Services for its reasonable REA preparation costs on the basis that Voucher 202C included legal costs that are unallowable under 10 C.F.R. § 719, *Contractor Legal Management Requirements*. The requirements set forth in 10 C.F.R. § 719 do not apply to costs incurred by MOX Services to prepare the REA.

91.   As a result of NNSA's breach, MOX Services has suffered damages in the amount of $2,244,972.

## COUNT V -  DECLARATORY RELIEF (REQUEST FOR EQUITABLE ADJUSTMENT PREPRATION COSTS)

92.   MOX Services' realleges all of the preceding paragraphs as if fully stated herein.

93.   On February 15, 2016, MOX Services submitted a certified claim for REA preparation costs in the amount of $2,244,972. Dkt. No. 1-1.

94.   On May 11, 2016, NNSA wrongly denied MOX Services' claim in the COFD (Dkt. No. 1-2). In the COFD, NNSA determined that 10 C.F.R. §719 applied to MOX Services' use of retained legal counsel to assist in the preparation of the REA. NNSA asserted that the costs incurred were unallowable because MOX Services did not submit the engagement letter with its attorneys "upon execution," as required under §719.20. NNSA further claimed that the costs are unallowable because MOX

Services did not obtain pre-approval for its use of "expert witnesses and consultants," citing §719.44(a)(4).  For these reasons, NNSA concluded that "all costs which are the subject of MOX Services' claim are unallowable."

95.     The COFD incorrectly applied 10 C.F.R. §719 to costs incurred by MOX Services to prepare the REA.  The regulations set forth at 10 C.F.R. §719 do not apply to costs incurred to prepare an REA, including costs incurred by attorneys and other professional consultants hired for that purpose.  Such costs are normal contract administration costs that are allowable under 48 C.F.R. §31.205-33.

96.     The parties have a clear dispute regarding the applicability of 10 C.F.R. §719 to MOX Services' incurred professional consultant costs in investigating and preparing its REA concerning incentive fee entitlement.

97.     The speedy resolution of this straightforward contract interpretation dispute is necessary to provide certainty to the parties and to prevent undue financial hardship to MOX Services caused by NNSA's incorrect application of 10 C.F.R. §719 to contract administration costs.  MOX Services respectfully requests that under Rule 57 of the Rules of the United States Court of Federal Claims this Court provide a speedy hearing on this Count V.

98.     Monetary damages alone will not provide adequate relief to MOX Services.  MFFF construction is ongoing and thus it is reasonably foreseeable that MOX Services will need to retain outside legal counsel and other consultants to assist with contract administration matters, which may include the preparation of future REAs.   It is therefore necessary and appropriate to resolve whether 10 C.F.R. §719 applies to contract administration costs, including legal costs incurred to prepare REAs.

25

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

99.    Enter an order awarding MOX Services damages for breach of contract in the amount of $74,490,019 of owed incentive fee, plus interest.

100.   Enter a declaratory judgment that the Contract does not permit NNSA to make a "Final Cost/Schedule Incentive Fee Payment Determination" until project completion, or permit NNSA to demand the return of any provisional incentive fee payments until project completion.

101.   Enter a declaratory judgment invalidating the COFD that determined the $21,600,000 in provisional Cost/Schedule Incentive Fee constitutes a debt to the government, and requiring NNSA to return such provisional incentive fee until the project completion, when "Final Cost/Schedule Incentive Fee Payment Determination" concludes that such incentive fee shall convert to final payments or shall be returned to NNSA.

102.   Enter an order awarding MOX Services $105,189,406 of owed fixed fee, plus interest.

103.   Enter an order awarding MOX Services damages for breach of contract in the amount of $2,224,972 for allowable REA preparation costs that NNSA has refused to pay.

104.   Enter a declaratory judgment holding that attorney and other professional consultant costs incurred by MOX Services in investigating and preparing an REA do not constitute "legal costs" that must comply with the requirements set forth at 10 C.F.R. §719.

105.   Under Rule 57 of the Rules of the United States Court of Federal Claims, order a speedy hearing on Counts II and V of this Supplemental Complaint.

106.   Grant MOX Services such other and further relief as the Court deems just and proper.

Dated:  November 3, 2017                    Respectfully submitted,

                                           ROGERS JOSEPH O'DONNELL

                                           By:  */s/ Mark J. Linderman*
                                           Mark J. Linderman (Counsel of Record)
                                           Dennis J. Callahan
                                           Stephen L. Bacon

                                           ROGERS JOSEPH O'DONNELL
                                           311 California Street, 10th Floor
                                           San Francisco, CA 94104
                                           Tel: (415) 956-2828
                                           Fax: (415) 956-6457
                                           Email: mlinderman@rjo.com

                                           *Attorneys for Plaintiff CB&I AREVA MOX*
                                           *Services, LLC*

Supplemental Complaint for Damages and Declaratory Relief, No. 16-CV-950