## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| CB&I AREVA MOX Services, LLC | ) | |
| | ) | No.: 16-950C |
| Plaintiff, | ) | (Judge Wheeler) |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF CB&I AREVA MOX SERVICES, LLC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

**ROGERS JOSEPH O'DONNELL, PC**
Mark J. Linderman (Counsel of Record)
Dennis J. Callahan
Stephen L. Bacon
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828 (Telephone)
(415) 956-6457 (Facsimile)
mlinderman@rjo.com; dcallahan@rjo.com; sbacon@rjo.com
Attorneys for CB&I AREVA MOX SERVICES, LLC

December 27, 2017

## TABLE OF CONTENTS

Page(s)

QUESTIONS PRESENTED ..................................................................................1

JURISDICTION AND STANDARD OF REVIEW ...........................................2

I.  COUNT II – THE NNSA IMPROPERLY CLAWED BACK
    INCENTIVE FEE FROM MOX SERVICES......................................................3

    A.  Uncontroverted Facts Relevant To Count II.......................................3

        1.  Option 1 Contract Provisions ...................................................3

        2.  Incentive Fee Awards...................................................................6

        3.  NNSA Claws Back Provisional Incentive Fee.......................8

    B.  Argument:  MOX Services Is Entitled To A Declaratory
        Judgment Invalidating The COFD That Clawed Back
        Provisional Incentive Fee ...........................................................9

    C.  Declaratory Relief is Appropriate to Address the Parties'
        Fundamental Dispute About the Proper Timing of Provisional
        Fee Claw Back ...........................................................................12

II. COUNT V – REQUEST FOR EQUITABLE ADJUSTMENT
    PREPARATION COSTS ARE NOT SUBJECT TO 10 C.F.R.
    PART 719...............................................................................................15

    A.  Uncontroverted Facts Relevant to Count V .....................................15

    B.  Argument: The Costs of MOX Services' Outside Counsel and
        Other Consultants Retained to Help Prepare the REA Are Not
        Subject to 10 C.F.R. Part 719 .....................................................16

        1.  Allowing the Costs of REA Preparation Work In
            Appropriate Circumstances Promotes Important
            Government Goals ...................................................................17

        2.  10 C.F.R. Part 719 Concerns Matters Where the
            Government's Interest is Aligned With The Contractor's,
            and it Does Not Concern the Preparation of REAs that
            Are to Be Negotiated...............................................................20

    C.  Declaratory Relief is Appropriate as to Count V ............................24

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alaska Lumber & Pulp Co. v. United States,*
  2 F.3d 389 (Fed. Cir. 1993)...................................................................9, 11

*Alliant Techsystems, Inc. v. United States,*
  178 F.3d 1260 (Fed. Cir. 1999)..........................................................2, 13, 24

*Bill Strong Enters. v. Shannon,*
  49 F.3d 1541 (Fed. Cir. 1995)...........................................................17, 18, 19

*C. Sanchez and Son, Inc. v. United States,*
  6 F.3d 1539 (Fed. Cir. 1993)...................................................................9

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)...............................................................................2

*Cont'l Can Co. v. Monsanto Co.,*
  948 F.2d 1264 (Fed. Cir. 1991).................................................................2

*Fluor Enters. v. United States,*
  64 Fed. Cl. 461 (2005) ..........................................................................13

*Forman v. United States,*
  329 F.3d 837 (Fed. Cir. 2003)..................................................................9

*Grumman Data Sys. Corp. v. Dalton,*
  88 F.3d 990 (Fed. Cir. 1996)...................................................................9

*NVT Techs., Inc. v. United States,*
  370 F.3d 1153 (Fed. Cir. 2004)...............................................................12

*Pac. Gas & Elec. Co. v. United States,*
  110 Fed. Cl. 143 (2013) .........................................................................14

*SUFI Network Servs. v. United States,*
  105 Fed. Cl. 184 (2012) ....................................................................17, 18, 19

## Regulations

10 C.F.R. Part 719 .................................................................... *passim*

48 C.F.R. §31.205-13 ......................................................................13

48 C.F.R. §31.205-21 ......................................................................13

48 C.F.R. §31.205-33 ...................................................................24, 25

# TABLE OF AUTHORITIES
### (Continued)

Page(s)

48 C.F.R. §31.205-34 ..................................................................................................13

48 C.F.R. §31.205-47 ..................................................................................................17

48 C.F.R. §931.205-33 ............................................................................................20, 21

48 C.F.R. §952.216-7. ..................................................................................................20

48 C.F.R. §952.231-71 ..................................................................................................20

**Other Authorities**

61 FR 14673 (April 3, 1996) ..................................................................................................22

66 FR 4616 (Jan. 18, 2001) ..................................................................................................23

78 FR 25795 (May 3, 2013) ..................................................................................................23

DOE Acquisition Letter No. AL 2013-07 (June 4, 2013), *available at*
    https://energy.gov/sites/prod/files/2016/02/f29/AL%202013-07.pdf................................21

Plaintiff CB&I AREVA MOX Services, LLC ("MOX Services") moves for partial summary judgment on the two Declaratory Relief causes of action of its Supplemental Complaint for Damages and Declaratory Relief ("Supplemental Complaint"), Counts II and V. Count II presents a pure question of contract interpretation, and concerns whether the Defendant United States, acting through the Department of Energy's National Nuclear Security Administration ("NNSA"), prematurely clawed back $21.6 million of Cost/Schedule Incentive Fee ("Incentive Fee") payments it had made to MOX Services.

Count V presents a pure question of regulatory interpretation, and concerns whether the attorney fees and other professional consultant costs claimed by MOX Services for reimbursement as contract administration costs incurred in investigating and preparing a Request for Equitable Adjustment ("REA") constitute "legal costs" that must comply with the requirements set forth at 10 C.F.R., Part 719.

## QUESTIONS PRESENTED

(1)     Whether under Count II MOX Services is entitled to a declaratory judgment invalidating the Contracting Officer's Final Decision that determined the $21,600,000 in provisional Cost/Schedule Incentive Fee constitutes a debt to the government, and requiring NNSA to return such provisional incentive fee until project completion.

(2)     Whether under Count V MOX Services is entitled to a declaratory judgment holding that attorney and other professional consultant costs incurred by MOX Services in investigating and preparing a Request for Equitable Adjustment do not constitute "legal costs" that must comply with the requirements set forth at 10 C.F.R., Part 719.

1

## JURISDICTION AND STANDARD OF REVIEW

The Federal Rules of Civil Procedure and the Rules of the Court of Federal Claims permit a motion for summary judgment on all or part of a claim or defense.  RCFC 56(a).  The summary judgment process is designed to avoid trial where there is no genuine issue of material fact.  *Cont'l Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1265 (Fed. Cir. 1991).  The moving party has the initial burden of showing an absence of genuine issues of material fact, and that the facts entitle it to judgment as a matter of law.  RCFC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

The Court has jurisdiction under the Tucker Act "to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms." *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1270 (Fed. Cir. 1999).  During contract performance, the Court has broad discretion to grant declaratory relief if the claim presents "a fundamental question of contract interpretation or a special need for early resolution of a legal issue." *Id.* at 1272.  When deciding whether it is appropriate to grant declaratory relief, the Court should consider "whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Id.* at 1271.

I. **COUNT II – THE NNSA IMPROPERLY CLAWED BACK INCENTIVE FEE FROM MOX SERVICES**

A. **Uncontroverted Facts Relevant To Count II**

MOX Services is the prime contractor that is constructing NNSA's Mixed Oxide Fuel Fabrication Facility ("MFFF") at the Savannah River Site in South Carolina. The parties refer to the definitized contract for MFFF construction as "Option 1." *See* Appx. 35, Dkt. 21-1, p. 276 of 721 (Incentive Fee COFD at p. 3, n.7).[1]

1. **Option 1 Contract Provisions**

Under Option 1, MOX Services is eligible to earn quarterly cost/schedule incentive fee for making progress toward completing MFFF construction within certain cost and schedule parameters. The contract's Incentive Fee provisions are set forth in Section B.3(b)(1) ("Cost/Schedule Incentive Fee") and Section J, Attach. 7 ("Cost/Schedule Incentive Fee Plan"). Appx. 6-7, 23-29, Dkt. 21-1, p. 698, 715-717 of 721.

Specifically, for each of the 32 fiscal year quarters from the first quarter of 2008 through the last quarter of 2015, so long as its performance was within the contract's cost and schedule parameters, MOX Services would be entitled to Incentive Fee payments. Appx. 28, Dkt. 21-1, p. 720 of 721 ("Incentive Fee Amounts by FY (6.75% Fee Schedule"). The cost parameter is tied to the value of Contract Line Item Number 002 (MFFF design and construction, including Option 1) and the schedule parameter is tied to "period of performance established by the approved project schedule." Appx. 6., Dkt. 21-1, p. 698 of 721 (Contract Clause B.3(b)(1)(i)).

---

[1] For the Court's ease of reference, under RCFC 5.4(a)(2)(G), Plaintiff has prepared an Appendix to this memorandum that includes the docketed materials. All such citations will list the "Appx" citation first, followed by the Docket Number ("Dkt.") citation.

The Incentive Fee provisions also include a vesting schedule under which NNSA's quarterly Incentive Fee payments to MOX Services initially were 100% provisional. So long as MOX Services' performance remained within the cost and schedule parameters, half of the provisional Incentive Fee payments would become final and irrevocable at the end of the fifth quarter following the quarter in which the Incentive Fee was earned.  Appx. 7., Dkt. 21-1, p. 699 of 721 (Contract Clause B.3(b)(1)(iv); *see* Appx. 39, Dkt. 21-1, p. 280 of 721 (Incentive Fee COFD at 7, summarizing provisional incentive fee values).

In the event that NNSA determined that MOX Services' performance exceeded the cost and schedule parameters, incentive fee payments "for that period [would] be suspended and rolled over into future periods."  Appx. 7., Dkt. 21-1, p. 698-99 of 721 (Contract Clause B.3(b)(1)(ii).  Likewise, that same determination would suspend vesting, and all "incentive fee that is provisional shall remain provisional until the Contractor's performance improves to once again fall within established cost and schedule parameters."  Appx. 7., Dkt. 21-1, p. 699 of 721 (Contract Clause B.3(b)((1)(iv)).

If in later periods NNSA determined that MOX Services' performance had recovered and was once again within the cost and schedule parameters, MOX Services would be paid the Incentive Fee for that period and for any previous quarter in which the Incentive Fee had been suspended.  Appx. 7., Dkt. 21-1, p. 698-699 of 721 (Contract Clause B.3(b)((1)(ii)).  Similarly, NNSA's determination that MOX Services once again satisfied the cost and schedule performance criteria would restart vesting.  Appx. 7., Dkt. 21-1, p. 699 of 721 (Contract Clause B.3(b)((1)(iv)); Appx. 24, Dkt. 21-1, p. 716 of 721 (Contract Section J, Attach. 7, Cost/Schedule Incentive Fee Plan ("Previously paid out Incentive Fee that is

provisional at the time payments are suspended shall remain provisional until payments resume.")).

The Cost/Schedule Incentive Fee clause is silent regarding the disposition of provisional incentive fee before the MFFF is completed and where NNSA has determined that MOX Services' performance has not recovered to meet the parameters. This direction is contained in the "Collateral Savings/Cost Share" clause of Section B.4(a)(ii). Appx. 8., Dkt. 21-1, pp. 699-700 of 721 (Contract Clause B.4). Under the "Collateral Savings" portion of the clause, MOX Services is entitled to receive a 25% share of the savings if the project costs less than the adjusted Total Project Costs ("TPC"). But under the "Cost Share" portion of the clause, MOX Services must pay NNSA a 25% share of the cost overruns if the project costs are more than the TPC, but only up to "an amount equal to the remaining provisional fee." Appx. 8., Dkt. 21-1, p. 700 of 721 (Contract Clause B.4(a)(ii).

This final determination regarding provisional Incentive Fee is to take place only once the MFFF has been fully constructed and accepted by NNSA. The Collateral Savings/Cost Share provision states that whether MOX Services receives "Collateral Savings" or, rather, pays "Cost Share," will be determined when the MFFF construction is completed and NNSA accepts the plant:

> For determining the Collateral Savings/Cost Share, the Government will use the total allowable, final project costs for the physical completion and acceptance of the MFFF. … If the total allowable, final project costs are less than the adjusted TPC, the Contractor shall be entitled to 25 cents for every dollar under. If the total allowable, final project costs exceed the adjusted TPC, the Contractor shall be liable for 25 cents for every dollar over. The Contractor's share of any adjusted TPC overrun shall be limited to an amount equal to the remaining provisional incentive fee referenced in Section B.3 as calculated prior to the final fee payment upon physical completion of the MFFF.

Appx. 8., Dkt. 21-1, pp. 699-700 of 721 (Contract Clause B.4(a)(ii) (emphasis added)).

Likewise, the Final Cost/Schedule Incentive Fee Payment Determination clause of the Cost/Schedule Incentive Fee Plan states that the ultimate Incentive Fee determination will be made "at project completion," which the clause defines as NNSA's acceptance of MOX Services' project completion package (Critical Decision 4). Appx. 25., Dkt. 21-1, p. 717 of 721. This clause also unambiguously provides that the disposition of provisional Incentive Fee is to occur only after MFFF construction is completed by MOX Services and accepted by NNSA. Appx. 25., Dkt. 21-1, p. 717 of 721.

There is no contract provision that states that NNSA is allowed to claw back provisional Incentive Fee before physical completion of the MFFF.

### 2.    Incentive Fee Awards

From the first quarter of 2008 through the fourth quarter of 2010, the parties agreed that MOX Services' performance met the cost and schedule criteria. Appx. 38., Dkt. 21-1, p. 279 of 721 (Incentive Fee COFD at 6). Starting in the first quarter of 2011, NNSA considered MOX Services' performance to have failed to meet the incentive fee cost and/or schedule parameters. Appx. 38., Dkt. 21-1, p. 279 of 721 (Incentive Fee COFD at 6) (stating that NNSA rejected MOX Services' Incentive Fee invoice for the first quarter of FY 2011). From that point on NNSA suspended further Incentive Fee payments and, related, refused to consider previously paid incentive fee that remained provisional to have vested.

Under the 6.75% Fee Schedule,[2] as shown in the following chart, at the end of

the fourth quarter of 2010, NNSA had paid MOX Services $29,100,000 in Incentive Fee

(Column A).  Of this amount, $7,500,000 was vested or final Incentive Fee (Column C), and

$21,600,000 was unvested or provisional Incentive Fee (Column B).  Appx. 39., Dkt. 21-1,

p. 280 of 721 (Incentive Fee COFD at 7).

**Chart 1: Incentive Fee Payments and Values**[3]

| | A | | B | C |
|---|---|---|---|---|
| **Period Earned** | **Quarterly Incentive Amount Available** | **Provisional %** | **Provisional Value** | **Final Value** |
| 2008, Q1 | $750,000 | 50% | $375,000 | $375,000 |
| 2008, Q2 | $750,000 | 50% | $375,000 | $375,000 |
| 2008, Q3 | $750,000 | 50% | $375,000 | $375,000 |
| 2008, Q4 | $750,000 | 50% | $375,000 | $375,000 |
| 2009, Q1 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |
| 2009, Q2 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |
| 2009, Q3 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |
| 2009, Q4 | $3,000,000 | 50% | $1,500,000 | $1,500,000 |
| 2010, Q1 | $3,525,000 | 100% | $3,525,000 | |
| 2010, Q2 | $3,525,000 | 100% | $3,525,000 | |
| 2010, Q3 | $3,525,000 | 100% | $3,525,000 | |
| 2010, Q4 | $3,525,000 | 100% | $3,525,000 | |
| **Totals** | $29,100,00 | | $21,600,000 | $7,500,000 |

---

[2]  The parties dispute whether the applicable fee schedule is the 6.75% schedule or the 7% schedule.  For purposes of the present motion, MOX Services uses the 6.75% schedule, which results in lower incentive fee amounts.

[3] The chart is taken from NNSA's Incentive Fee COFD (Appx. 39., Dkt. 21-1, p. 280 of 721), and it subtracts the "Provisional Values" from the "Available Values" shown in NNSA's chart to determine "Final Values," and calculates "Totals" for each column.

### 3. NNSA Claws Back Provisional Incentive Fee

On or about September 29, 2016, MOX Services submitted a certified claim to NNSA for approximately $53 million in suspended Incentive Fee, which represented the Incentive Fee amounts from fiscal years 2011 to 2015 that NNSA had not paid.  Appx. 31., Dkt. 21-1, p. 2 of 721.  In answer to this certified claim, in a single letter NNSA issued two Contracting Officer's Final Decisions ("COFD").  Appx. 33., Dkt. 21-1, p. 274 of 721.

The first COFD, which is not implicated in the present motion, denied MOX Services' affirmative claim to entitlement to payment of suspended Incentive Fee.  Appx. 35., Dkt. 21-1, p. 276 of 721 (Incentive Fee COFD at 3).

The second COFD required MOX Services to return the $21.6 million in provisional Incentive Fee in the contractor's possession.  NNSA concluded that "cost overruns" and the current estimated project completion date means that "no Incentive Fee has been earned or is prospectively earnable under the contract," and that MOX Services must return all provisional Incentive Fee to NNSA.  Appx. 38., Dkt. 21-1, p. 279 of 721 (Incentive Fee COFD at 6).  In the COFD, NNSA claimed that the Collateral Savings/Cost Share clause is not relevant before project completion.  Appx. 35-36., Dkt. 21-1, p. 276-277 of 721 (Incentive Fee COFD at 3-4, n.8).  For support of the timing of its claw back action, NNSA relied on the "Final Incentive Fee Payment" clause at Section J, Attach. 7, Paragraph 7 of the Cost/Schedule Incentive Fee Plan.  Appx. 37-38., Dkt. 21-1, pp. 278-279 of 721 (Incentive Fee COFD at 5-6).  In doing so, however, the contracting officer ignored that the provision requires the MFFF to be completely constructed and accepted.  *See* Appx. 26., Dkt. 21-1, p. 718 of 721 ("The final incentive fee determination will be based on the total allowable, final project costs for the physical completion and acceptance of the MFFF.").

Rather, NNSA prospectively determined that no Incentive Fee was "earnable under the contract." Appx. 38., Dkt. 21-1, p. 279 of 721 (Incentive Fee COFD at 6).

MOX Services has not completed construction of the MFFF. Through a combination of direct payments and reduced NNSA payments of MOX Services' invoices, MOX Services has met NNSA's demand to repay the $21.6 million provisional Incentive Fee and interest.

**B.     Argument:  MOX Services Is Entitled To A Declaratory Judgment Invalidating The COFD That Clawed Back Provisional Incentive Fee**

The interpretation of a contract is a legal question that is subject to summary judgment. *Forman v. United States,* 329 F.3d 837, 841 (Fed. Cir. 2003). "A contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1543 (Fed. Cir. 1993). Provisions that are clear and unambiguous must be given their plain and ordinary meaning. *Alaska Lumber & Pulp Co. v. United States,* 2 F.3d 389, 392 (Fed. Cir. 1993). A contract is ambiguous only where its terms are amenable to more than one reasonable interpretation. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed. Cir. 1996).

Here, the contract clearly and unambiguously provides that Incentive Fee NNSA pays to MOX Services is to remain in MOX Services' possession until MFFF construction is completed. Only after project completion does any unvested Incentive Fee (*i.e.,* provisional Incentive Fee that has not converted to final Incentive Fee) become subject to potential payback to NNSA. That potential payback may occur under the Collateral Savings/Cost Share clause.

Regarding provisional Incentive Fee in circumstances where NNSA has determined that MOX Services' performance no longer meets the cost or schedule criterion, the Cost/Schedule Incentive Fee clause plainly requires that such provisional Incentive Fee "shall remain provisional" until MOX Services' performance recovers.   Appx. 7., Dkt. 21-1, p. 699 of 721 (Contract Clause B.3(b)(iv)).  Fully consistent with this plain statement, the Cost/Schedule Incentive Fee Plan states that previously paid Incentive Fee that is provisional at the time NNSA suspends new Incentive Fee payments "shall remain provisional until payments resume."  Appx. 24., Dkt. 21-1, p. 716 of 721.

Both of these unambiguous clauses prohibit the action taken by NNSA in clawing back provisional Incentive Fee.  The only express contract provision that gives rise to the potential for MOX Services to be required to repay Incentive Fee is the Collateral Savings/Cost Share provision.  And that clause repeatedly and unambiguously comes into play only after the MFFF construction is complete.  The Collateral Savings/Cost Share analysis is performed at "<u>project completion</u>" (Appx. 7., Dkt. 21-1, p. 699 of 721 (Contract Clause B.4(a)(i))) (emphasis in original), and requires a determination of "final project costs" (Appx. 8., Dkt. 21-1, p. 700 of 721 (Contract Clause B.4(a)(ii))), which, of course can only be ascertained after MFFF construction is completed.  At that time – and not sooner – a reconciliation is to occur whereby MOX Services shares 25% of the cost underrun, or must absorb 25% of the cost overrun in an amount limited to the "remaining provisional incentive fee."  Appx. 8., Dkt. 21-1, p. 700 of 721 (Contract Clause B.4(a)(ii)).

The Cost/Schedule Incentive Fee Plan repeats this timing in every particular. It states that provisional Incentive Fee paid for periods before NNSA had determined that MOX Services' performance no longer met the Incentive Fee criteria "shall remain

10

provisional until [Incentive Fee] payments resume." Appx. 24., Dkt. 21-1, p. 716 of 721. It

further states that the "Final Cost/Schedule Incentive Fee Payment Determination," including

the decision whether or not provisional Incentive Fee is to be converted to Final Incentive

Fee, is to be made "[a]t project completion," which is defined as NNSA's acceptance of

MOX Services' project completion package (Critical Decision 4). Appx. 25., Dkt. 21-1, p.

717 of 721.

  The COFD's reliance on the Final Incentive Fee Payment clause at Section J,

Attach. 7, Paragraph 7 (Appx. 37-38., Dkt. 21-1, pp. 278-279 (Incentive Fee COFD at 5-6))

is misplaced. The final Incentive Fee payment necessarily comes after the "Final

Cost/Schedule Incentive Fee Payment Determination," which is made after MFFF

construction is complete and accepted. Appx. 25., Dkt. 21-1, p. 717 of 721. This clear

timing is found in the Final Incentive Fee Payment provision itself, which recognizes that the

final determination of MOX Services' success or failure under the Incentive Fee cost

parameter is to be based on "final project costs for the physical completion and acceptance of

the MFFF." Appx. 26., Dkt. 21-1, p. 718 of 721.

  This interpretation comports with the clear, plainly read language of the

contract. *Alaska Lumber,* 2 F.3d at 392. The COFD wrongly treats the statement "final

evaluation period, i.e., September 2016 (if that date is not extended)" as a date set in stone, to

conclude that NNSA could determine MOX Services' final Incentive Fee entitlement while

acknowledging that performance is ongoing. Appx. 36., Dkt. 21-1, p. 277 of 721 (Incentive

Fee COFD at 4). But the "Final Incentive Fee Payment" clause itself recognizes that the

final evaluation period date is flexible, and will extend to when MFFF construction is

complete and the facility is accepted by NNSA.

Not only does this plain reading of the contract language hold the virtue of giving consistent effect to all of the statements in the contract *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1165 (Fed. Cir. 2004), it also makes sense.  Allowing MOX Services to retain the provisional Incentive Fee payments until the MFFF construction contract is completed maintains the status quo until major project-altering events occur.  Such events could be project completion, a negotiated rebaselining of the project that includes settlement of fee issues, contract termination, or other.  The clear and unambiguous contract terms sensibly call for provisional Incentive Fee to reside with the contractor unless and until such a watershed event occurs.

### C. Declaratory Relief is Appropriate to Address the Parties' Fundamental Dispute About the Proper Timing of Provisional Fee Claw Back

NNSA has created a fundamental dispute between the parties regarding when the contract allows it to claw back the $21.6 million in provisional Incentive Fee paid to MOX Services.  It is appropriate for this Court to resolve that question now. As demonstrated above, the payment terms negotiated by the parties at arms-length provide that MOX Services is entitled to retain provisional Incentive Fee during contract performance. Yet, through its premature claw back of the provisional Incentive Fee, NNSA has arbitrarily deprived MOX Services of this bargained-for benefit. Expedited declaratory relief is the only remedy that can appropriately address NNSA's misinterpretation of the contract which caused it to make the premature repayment demand.

There is a special need to resolve the proper timing of provisional Incentive Fee claw back now.  NNSA currently possesses $21.6 million that MOX Services is contractually entitled to have at its disposal while the contract is performed.  NNSA's

improper clawback of provisional Incentive Fee denies MOX Services important benefits to which it is entitled.  Specifically, but for NNSA's improper claw back, MOX Services would be able to use the money to fund unallowable business expenses or make capital investments.

Fee does not represent just profit; rather, it is well-recognized that contractors use fee to offset costs that are not reimbursable under a cost-type contract like the one at issue here.  *Fluor Enters. v. United States*, 64 Fed. Cl. 461, 473 (2005) (citing 48 C.F.R. § 15.404-4(a)(1)).  For example, a contractor's fee may be used to fund unallowable costs to support employee morale, labor relations, recruitment, and other similar discretionary business functions.  *See, e.g.*, 48 C.F.R. §§31.205-13; 31.205-21; 31.205-34.  Contractors like MOX Services rely on fee to fund these legitimate business expenditures.  Having negotiated the right to retain Incentive Fee amounts paid provisionally, MOX Services is now entitled to use that money to fund the unallowable costs of its business operations while construction is ongoing.

All of the "prudential considerations" set forth in *Alliant* favor the issuance of a declaratory judgment that provides MOX Services an adequate remedy for NNSA's improper claw back of the provisional Incentive Fee.  *Alliant Technsystems, Inc. v. United States*, 178 F.3d 1260, 1271 (Fed. Cir. (1999).  First, the COFD has triggered a live dispute between the parties concerning the appropriate timing of the final disposition of provisional Incentive Fee.  Second, a declaratory judgment will resolve that dispute by determining when that disposition is to take place.  And third, no other legal remedy provides an adequate replacement for declaratory relief under the circumstances.

Regarding the third consideration of adequate legal remedies, MOX Services' potential entitlement to monetary damages to recover Incentive Fee does not address its

present right to use provisional Incentive Fee.  Even if MOX Services wins a monetary

judgment at some later date, potentially years hence, it will not have regained the contractual

benefit that NNSA deprives it of each day that the Agency improperly holds the money.  And

even if MOX Services does not prevail on its claim for monetary damages under Count I,

that result would not change MOX Services' entitlement to declaratory relief now.  Whether

MOX Services is ultimately entitled to *permanently retain* Incentive Fee payments is of no

moment to the question of whether it may *temporarily retain* those payments during contract

performance. This Court should exercise its broad discretion to grant MOX Services

declaratory relief that resolves this straight-forward question of contract interpretation by

invalidating the COFD which improperly deprives MOX Services of its right to use

provisional Incentive Fee payments until construction is completed.

      Nor should MOX Services' claim for damages under Option 1's Incentive Fee

provisions preclude declaratory judgment.  It is well-settled that "the court may consider

declaratory relief, even when there is the potential for damage claims in the future." *Pac. Gas*

*& Elec. Co. v. United States*, 110 Fed. Cl. 143, 146 (2013) (citing *Emery Worldwide Airlines,*

*Inc. v. United States*, 47 Fed. Cl. 461, 472 (2000) ("The court rejects defendant's position that

we should dismiss [the declaratory relief claim] because plaintiff may, at some point, have a

claim for damages.")).

      Here, MOX Services' monetary claim does not preclude its claim for

declaratory relief because those claims involve separate contract breaches that involve

different harms that require different remedies.  The monetary claim seeks a remedy for the

changes caused by NNSA, and the realized risks assumed by NNSA, that have impacted the

contract's cost and schedule.  MOX Services claim will demonstrate that, once the contract's

cost and schedule are appropriately adjusted, MOX Services performance fell within the Cost/Schedule Incentive Fee payment bands.  That claim is complex and will take substantial time to litigate and resolve.

## II.   COUNT V – REQUEST FOR EQUITABLE ADJUSTMENT PREPARATION COSTS ARE NOT SUBJECT TO 10 C.F.R. PART 719

### A.   Uncontroverted Facts Relevant to Count V

In June 2015, MOX Services submitted Request for Equitable Adjustment 15-001, "Cost/Schedule Incentive Fee Payment," to NNSA.  *See* Appx. 52, Dkt. 1-1, p. 9 of 19 (NNSA letter discussing the REA).  The REA concluded that MOX Services was entitled to cost and schedule adjustments that would bring MOX Services' performance within the parameters required for the award of suspended incentive fee.  *See* Appx. 33., Dkt. 21-1, p. 274 of 721 (Incentive Fee COFD describing the REA and certified claim for Incentive Fee as materially unchanged and stating that NNSA's rationale for denying an equitable adjustment "apply equally" to the Incentive Fee certified claim).

In discussions with NNSA officials in the summer of 2015 concerning the REA, MOX Services informed NNSA that MOX Services had expended over $2 million for outside counsel and accounting consultants to help investigate and prepare it.  Appx. 52., Dkt. 1-1, p. 9 of 19 (NNSA letter describing the discussions).  MOX Services informed NNSA that MOX Services would seek reimbursement of these REA preparation costs. Appx. 52, Dkt. 1-1, p. 9 of 19.  The parties disputed whether the REA preparation costs would be allowable as contract administration expenses.

On August 17, 2015, the parties agreed that MOX Services would submit a separate invoice for the REA preparation costs in order to isolate these costs from other of

MOX Services' costs.  Appx. 52., Dkt. 1-1, p. 9 of 19.  Thereafter, MOX Services submitted Voucher 202C in the amount of $2,244,972 for reimbursement of professional costs incurred in the preparation of the REA.  Appx. 62., Dkt. 1-1, p. 19 of 19.  NNSA refused to pay the voucher.

        After NNSA refused to pay Voucher 202C, on February 15, 2016, MOX Services submitted a certified claim for the $2,244,972.  Appx. 45., Dkt. 1-1, p. 2 of 19.  In a May, 11, 2016, Contracting Officer's Final Decision, NNSA denied the certified claim. Appx. 64., Dkt. 1-2, p. 2 of 11.  Among other reasons for denying the certified claim, NNSA maintained that the REA preparation costs are unallowable because MOX Services failed to comply with 10 C.F.R. Part 719.  Appx. 68-69., Dkt. 1-2, pp. 6-7 of 11.  In particular, the COFD concluded that MOX Services failed to comply with 10 C.F.R. §719.20, which required MOX Services to submit a copy of its engagement letter with counsel upon execution, and with §§719.40 and 719.44(a), which requires compliance with 10 C.F.R. Part 719 in order for MOX Services' legal counsel costs and consultant costs, respectively, to be allowable.  Appx. 69., Dkt. 1-2, p. 7 of 11.

> **B.     Argument: The Costs of MOX Services' Outside Counsel and Other Consultants Retained to Help Prepare the REA Are Not Subject to 10 C.F.R. Part 719**

        For the purposes of this motion MOX Services does not dispute that its contract with NNSA is covered by 10 C.F.R. Part 719 (*see* 10 C.F.R. §719.3(a)(2)) or that MOX Services submits Legal Management Plans to NNSA under 10 C.F.R. Part 719, Subpart B, as NNSA noted in its COFD.  MOX Services maintains, however, that its retention of a law firm and other consultants to help it prepare an REA does not give rise to the incurrence of "legal costs" under 10 C.F.R. §719.2 that must be vetted and pre-approved

by NNSA in order to be allowable per 10 C.F.R. §719.40.  Rather, expenses of outside entities, even law firms, incurred in providing assistance to MOX Services in investigating and preparing an REA are contract administration costs that presumptively are allowable.

**1.      Allowing the Costs of REA Preparation Work In Appropriate Circumstances Promotes Important Government Goals**

As this court has recognized, contractors routinely hire lawyers, accountants and other professionals to help them prepare REAs, particularly in matters that involve complex sets of circumstances.  *See SUFI Network Servs. v. United States,* 105 Fed. Cl. 184, 192 (2012).  And, as reflected in the many cases that address the allowability of professional fees incurred in preparing REAs, the work often falls in a murky area between contract administration and pre-litigation.  *Id.* at 193; *see Bill Strong Enters. v. Shannon,* 49 F.3d 1541, 1549 (Fed. Cir. 1995) ("[T]he line between costs that are incidental to contract administration and costs that are incidental to prosecution of contract claims is rather indistinct.").

Making the distinction requires exploring the "'objective reason why the contractor incurred' the REA preparation costs."  *Id.*  If the costs of investigating and presenting the REA are genuinely incurred to further negotiations, the costs are presumptively allowable under FAR §31.205-47.  *Id.* (citing *Bill Strong,* 49 F.3d at 1550).  If, however, the contractor incurs the REA preparation costs for the purpose of readying litigation against the agency, the costs will be unallowable.  *Id.* (citing *Bill Strong,* 49 F.3d at 1550).  The contractor's purpose in incurring the REA preparation costs is key.  The end result, *i.e.,* whether the REA leads to a negotiated resolution that heads off a Board or Court of Federal Claims appeal, is not.  *Id.* at 193; *see Bill Strong,* 49 F.3d at 1550.

17

The reasoning that underpins these decisions is that a contractor's preparation and submission of REAs can provide important information to the government that allows the contract to proceed, and facilitates the negotiation and settlement of disputes without litigation.  This government benefit exists at the time of REA submission, and is not discounted in the judicial analysis if litigation nonetheless is not avoided.  *Bill Strong,* 49 F.3d at 1550 (stating that the costs of REA preparation and subsequent negotiations should be allowable as the "process benefits the Government, regardless of whether a settlement is finally reached or whether litigation eventually occurs because the availability of the process increases the likelihood of settlement without litigation."); *SUFI Networks,* 105 Fed. Cl. at 193 & n.9 (observing from the *Bill Strong* case that so long as the REA "furthers negotiation or information exchange with the agency" the government receives a benefit, and that REAs provide a benefit to the agency in promoting negotiation over litigation).

In *SUFI Networks,* this court weighed many facts – including finding that the contractor engaged in regular, good faith negotiations with the government to settle differences, and that the contractor's "oversized" demand did not render the claim for professional fees infirm – before finding that the claim for attorney fees consisted of "compensable contract administration costs" under the controlling *Bill Strong* case.  *Id.* at 194.  Likewise, in *Bill Strong* the contractor's professional costs incurred in preparing an REA following a contested DCAA audit was an "exchange of information [that] is exactly what is encompassed in the concept of contract administration." *Id.* at 1550.

When presented with MOX Services' claim for reimbursement of its REA preparation costs, NNSA sought refuge in the argument that MOX Services' professional services costs were not allowable because they were not incurred in compliance with 10

18

C.F.R. Part 719.  Dkt. 1-1, pp. 6-7 of 11.  Among other things, NNSA noted that MOX

Services had not provided a copy of its retention letter with the professional services firms,

had not updated its Legal Management Plan, and had not received NNSA's pre-approval of

the expenditures.  Only after making that argument did NNSA address the underlying

purpose for which MOX Services incurred professional and consultant costs in preparing the

REA.  *See* Appx. 69-73., Dkt. 1-2, pp. 7-10 of 11.

       NNSA's view completely undermines the Federal Circuit's and this court's

rationale for making REA preparation costs allowable in appropriate circumstances.  If

retention of counsel and other professionals for the purpose of assisting on REAs were

subject to 10 C.F.R. Part 719, NNSA effectively would have a veto over MOX Services'

selection of counsel (10 C.F.R. §719.20) and rates (10 C.F.R. §719.41), and could subject the

professionals' work to audit (10 C.F.R. §719.46).  As *Bill Strong* (49 F.3d at 1540) and *SUFI*

*Networks* (105 Fed. Cl. at 193) recognize, REAs unavoidably are a somewhat adversarial

process.  Giving NNSA effective control over the contractor's REA preparation process, as

subjecting MOX Services to 10 C.F.R. Part 719 would do here, would discourage the use of

REAs, and thereby dissuade the generation of information that provides the basis for

negotiation and settlement, and would fast-track solvable disputes to litigation.

       MOX Services anticipates retaining professional firms to help it prepare future

REAs with respect to the MFFF project.  MOX Services believes that 10 C.F.R. Part 719

does not give NNSA the right to know, among other things, when and who MOX Services is

hiring to assist with REA preparations or what theories of recovery are considered and

discarded.  Nor should NNSA have the right to pre-approve or reject MOX Services'

selection of counsel.

**2.      10 C.F.R. Part 719 Concerns Matters Where the Government's Interest is Aligned With The Contractor's, and it Does Not Concern the Preparation of REAs that Are to Be Negotiated**

That the purview of 10 C.F.R. Part 719 should not cover REA preparation costs is further highlighted by the clauses that incorporate the Part into the contract.  In its COFD, NNSA notes that 10 C.F.R. Part 719 was incorporated in the contract on September 12, 2013, by the addition of DEAR 952.231-71, "Insurance – litigation and claims" (JULY 2013) via the bilateral contract modification 222.  Appx. 68., Dkt. 1-2, p. 6 of 11 (REA COFD at 3).  Specifically, DEAR 952.231-71 regulates the types of insurance coverage the contractor must maintain, and whether the costs of insurance and liabilities to third parties are allowable.  DEAR 952.231-71(a)-(f).  The clause also requires the contractor to segregate and account for litigation costs separately, and includes rules regarding the use of federal funds to finance litigation.  DEAR 952.231-71(g).  In short, the clause that NNSA claims sweeps counsel fees associated with the preparation of an REA into 10 C.F.R. Part 719 has nothing to do with the contractor's internal contract administration responsibilities.  Rather, it is entirely concerned with a contractor's liabilities to third parties (employees, subcontractors, tort claimants, etc.), and the allowability of insurance and litigation costs to protect and defend the contractor in such disputes.

Likewise, the COFD notes that the DOE cost principle DEAR 931.205-33 is incorporated in the contract through DEAR 952.216-7.  Appx. 68., Dkt. 1-2, p. 6 of 11 (REA COFD at 3, n.2).   DEAR 931.205-33 itself is concerned with insurance litigation and claims. That clause states: "If the clause at 48 C.F.R. §952.231-71 [or another "Insurance – litigation and claims" clause] is included in the contract … litigation and other legal costs are only allowable if both: incurred in accordance with 10 CFR part 719" and is not otherwise

unallowable.  This clause clearly addresses third-party litigation, not professional services that are internal to the contractor.

Indeed, when the latest revision to 10 C.F.R. Part 719 was promulgated, it revised DEAR 931.205-33. Shortly thereafter, the Department issued an Acquisition Letter that outlined how the changes would affect existing contracts.  The Letter stated that affected contracts are those that contain DEAR 931.205-33 "or otherwise reference the Department's *litigation management procedures and cost guidelines.*"  DOE Acquisition Letter No. AL 2013-07 at 4 (June 4, 2013), *available at* https://energy.gov/sites/prod/files/2016/02/f29/AL%202013-07.pdf  (emphasis added). Simply put, both regulations on which NNSA's COFD rely to categorically render MOX Services' REA preparation costs unallowable, 10 C.F.R. Part 719 and DEAR 931.205-33, are focused on litigation expenses in the context of third-party claims against the contractor.

As one reviews 10 C.F.R. Part 719 it becomes clear that it is concerned with third-party situations in which the contractor's interest is aligned with the government.  It is not concerned with work performed by lawyers and other professionals that is in the manner of contract administration, such as REA preparation costs.  To take a few examples:

- 10 C.F.R. §719.8 provides that because the contractor's and the government's interests are aligned, otherwise privileged legal documents do not lose their privileged character when the contractor shares them with the agency.  This provision is nonsense in the context of a contractor's attorney-client communications or attorney work product created in the investigation and preparation of an REA.  With respect to the REA, MOX Services' and NNSA's interests are not

aligned, and MOX Services could not share documents its counsel created in the REA preparation process while retaining the documents' privileged status.

- 10 C.F.R. Part 719, Subpart D concerns the government's power to direct the contractor to initiate, defend, and settle litigation.  This Subpart could only be applicable to third-party litigation.

- 10 C.F.R. §719.44 would require MOX Services to obtain NNSA's pre-approval to hire forensic accounting and scheduling consultants in the REA preparation process.  Such NNSA intrusiveness on MOX Services' REA preparation process would severely undermine the parties' ability to conduct good faith negotiations to settle disputes..

Finally, the regulatory history of 10 C.F.R. Part 719 confirms that the regulation is focused on controlling cost reimbursement contractors' costs of litigation with third parties.  The regulation originated as a "final policy statement" from DOE that was design to end "unacceptably high litigation costs from [management and operating] contractors in connection with the defense of lawsuits where the Department elected to have the contractor engage lawyers to conduct the litigation."  61 FR 14673, 14673 (April 3, 1996).

When first promulgated as a new regulation, Part 719 gave no indication that it was intended to cover a contractor's legal costs where the services were retained to represent the contractor in matters adversarial to the government.  Rather, DOE noted that it needed the information from contractors required by Part 719 in order to "justify the reimbursement

of the costs of litigation" and "to provide guidance" to the contractor.  66 FR 4616, 4617 (Jan. 18, 2001).  This litigation focus was continued in the "Guidance for Legal Resource Management" DOE provided in the new rule.  This Guidance concerned the initiation and defense of litigation (1.0, 2.0), disapproval of defensive litigation (2.1), notice to the Department of significant litigation (3.0) and alternative dispute resolution (4.0).  *Id.* at 4625. Thus, while in the Comments DOE stated that Part 719 covered non-litigation matters (66 FR at 4618), it did not state that it applied to matters where the contractor's interest was adverse to DOE's.  Indeed, the regulation's Background noted that none of the information required by Part 719 would effect a waiver of attorney-client privilege because the privilege is preserved where there is a common interest between the contractor and the government.  66 FR 4617.  This Background information would not make sense if it were to pertain to retained counsel's communications with the contractor in a matter where the government's interests were adverse (*i.e.,* common interest between the contractor and the government was absent).

The updated Part 719 regulations did not make any changes that are material to the analysis here.  The Background section published with the revised Part 719 notes that DOE "has an ongoing obligation to monitor and control the legal costs that it reimburses" and that it "has a long history of overseeing aspects of its contractors' management of legal matters and associated costs."  78 FR 25795, 25795 (May 3, 2013).  Accordingly, the revised Part 719 "establishes regulations to monitor and control legal costs and to provide guidance to aid contractors and the Department in making determinations regarding the reasonableness of outside counsel costs, including the costs associated with litigation."  *Id.*  As with the

earlier version of the regulation, the current version is targeted at third-party litigation and other legal matters where the contractor shares a common interest with the government.

## C.      Declaratory Relief is Appropriate as to Count V

As with Count I, declaratory relief on Count V is appropriate based on the "prudential considerations" outlined by the Federal Circuit in *Alliant*.   NNSA and MOX Services have a fundamental dispute concerning whether costs incurred to prepare an REA are governed by 10 C.F.R. Part 719.   This Court can resolve that dispute by issuing a declaratory judgment that determines, as a matter of law and contract interpretation, whether that DOE regulation was intended to displace the ordinary, well-established rule that REA preparation costs, including attorney's fees, are allowable contract administration costs.

Monetary damages alone are not adequate to remedy NNSA's misapplication of 10 C.F.R. Part 719.   NNSA's erroneous legal conclusion that the Part applies to REA preparation costs was the principle basis upon which it refused to pay Voucher 202C.   Appx. 68-69, Dkt. 1-2 , pp. 3-4 of 11.   A judicial determination as to Count V will eliminate or validate NNSA's legal defense to reimbursement of MOX Services' outside attorney costs incurred in preparing the REA that ultimately led to the Supplemental Complaint's allegations.   The resolution of this threshold issue will remove a major impediment to the parties' settlement of this $2.2 million claim and may, as a consequence, conserve judicial resources.   Alternatively, a declaratory judgment on Count V will streamline the litigation on Count IV (Breach of Contract – REA preparation costs) such that the only issues to be litigated will be whether the REA preparation costs were incurred for the genuine purpose of materially further negotiations between the parties, and whether the costs were reasonable and allowable under FAR 31.205-33.

24

A declaratory judgment is particularly appropriate here because whether MOX Services must comply with 10 C.F.R. Part 719 in order for its costs of preparing an REA to be recoverable is an issue that is very likely to recur and cause further disputes between the parties, if left unresolved.  In this action, MOX Services seeks certain types of fee on costs incurred only through April 2013, yet work under the construction contract is ongoing. MOX Services anticipates preparing REAs that relate to costs incurred in periods after April 2013, and submitting them to the government for negotiation.  MOX Services maintains that retaining counsel and other professional consultants to assist in investigating and preparing such REAs is an ordinary exercise of contract administration, which costs are reimbursable so long as they comport with FAR 31.205-33, and is not a "legal matter" governed by 10 C.F.R. Part 719.  And, as demonstrated above, it would be unjust, inappropriate and in conflict with the terms of the contract to force MOX Services to comply with the requirements of Part 719 should it decide to use retained counsel and other professional consultants to assist with future REA preparation.  This Court should exercise its discretion to issue a declaratory judgment that clarifies the parties' obligations as they relate to 10 C.F.R. Part 719.

## **CONCLUSION**

Based on the foregoing, the Court should grant MOX Services Motion for Partial Summary Judgment on Counts II and V.  On Count II, MOX Services is entitled to a declaratory judgment invalidating the COFD that determined the $21.6 million in provisional Incentive Fee constitutes a debt to NNSA, and requiring NNSA to return this money to MOX Services. On Count V, MOX Services is entitled to a declaratory judgment holding that attorney and

other professional consultant costs incurred by MOX Services in investigating and preparing

an REA are not subject to the requirements set forth at 10 C.F.R. Part 719.

Dated:  December 27, 2017

Respectfully submitted,
ROGERS JOSEPH O'DONNELL

By: _____

Mark J. Linderman (Counsel of Record)
Dennis J. Callahan
Stephen L. Bacon

ROGERS JOSEPH O'DONNELL
311 California Street, 10th Floor
San Francisco, CA 94104
Tel: (415) 956-2828
Fax: (415)956-6457

*Attorneys for Plaintiff CB&I AREVA MOX
Services, LLC*